Case 13-3253, Marilyn Shazor v. Professional Transit Management et al. Argument not to exceed 15 minutes per side. Ms. Wilson for the appellant. Good morning. Good morning, guys. May it please the Court, my name is Laura Wells Wilson, and I represent the appellant, Marilyn Shazor, in this matter. Also with me in the courtroom today are my co-counsel, Mike Jaffe, and Nathaniel Jones. With the Court's permission, Judge Cole, I'd like to reserve four minutes of rebuttal time. That's fine. You may proceed. Thank you. In this case, the District Court erred by granting summary judgment in favor of the appellees when, at a bare minimum, the evidence we presented in support of our motion and in opposition to the defendant appellee's motion clearly raises genuine issues of material fact and involves credibility determinations that must be resolved by a trier of fact or jury and cannot be decided by the District Court as a matter of law. Because there's more than sufficient evidence for a reasonable juror to conclude that Marilyn Shazor was discharged from her employment for impermissible reasons, we respectfully ask this Court to reverse and remand the District Court's decision. The District Court erred, essentially, by failing to fully consider the discriminatory remarks in context, leading the District Court to conclude, one, that there was no direct evidence of discrimination, and two, that appellant Marilyn Shazor had failed to establish a prima facie case of discrimination under the analysis for circumstantial evidence based on the Verdine-McDonald-Douglas case law. Our client, Marilyn Shazor, is a well-respected and highly accomplished management professional. She has an engineering degree from the U.S. Military Academy at West Point and an MBA from the University of Michigan. She received outstanding performance evaluations from SORDA when she took on the role of CEO. Just to clarify a point, she was the employee of the defendant, not of SORDA. Correct. She was an employee... In the least employee situation. Correct. She was an employee of PTM. And PTM provided her in 2009 with a very solid performance evaluation, noting that in no less than 10 out of 12 performance categories, she was rated as outstanding or satisfactory. Nevertheless, at the same time that the principals of PTM, Messrs. Setzer, Pock, and Scott, are publicly lauding her performance, privately, there's an exchange of emails that on their face evince discriminatory intent and discriminatory stereotyping against Ms. Shazor. The remarks include Mr. Scott referring to her as disloyal, a prima donna, noting that calling her not a team player in the worst case, questioning her tone, and referring to her as one hell of a bitch. Mr. Setzer refers to her as disloyal, untrustworthy, whining and immature, a fool, a punk. He refers to her and Melody Sawyer Richardson, who was then chair of the SORDA board as the girls, refers to Ms. Richardson as the wicked witch, and refers to Ms. Shazor as her highness. As noted in our brief, we submit these remarks clearly evince, in the context of this case, discriminatory animus based on race and gender. These were sophisticated businessmen who knew how to carry out determination in a seemingly non-discriminatory manner. And because they were decision makers and had authority over her role and her position with PTM and her role as the SORDA Metro CEO and the implementation of the SORDA contract, under this court's case law, including Talley v. Brambo-Pitino and the DiCarlo decision, as well, I believe, as the Bartlett decision, Bartlett v. Gates, Judge Clay, I know you wrote that opinion, and I believe, Judge Cole, you were on that panel. We submit that these discriminatory remarks contained in the emails, documentary evidence, not hearsay, not comments that have to be testified to and looked at under the 801 rules of hearsay, under the rules of evidence, but documentary evidence substantiated in emails exchanged between Messrs. Scott, Setzer, and Haack. Aren't most of these emails you refer to inappropriateness? They may be between Setzer and Scott, whereas the decision maker here arguably the person who fired her clients, Mr. Haack. Does that make a difference? Well, Your Honor, I would have two responses to that question. First of all, some of the emails are between Mr. Setzer and Mr. Scott. Some of the emails include Mr. Haack. Mr. Haack was CC'd on a number of them. There's a February 18, 2009 email where Scott sends a note to Mr. Setzer and Mr. Haack referring to Ms. Chaser as a prima donna, and in that email actually lobbying for her discharge, saying, I don't care to work with her anymore. She's the worst case, and she will eventually fail. There's another email exchange in May where Mr. Scott refers to her again as a prima donna. An email in July where there's an exchange between Mr. Haack, Mr. Setzer, and Mr. Scott. Mr. Haack has been, authored this email and said, I'm beginning to think we should act on Marilyn before she does any more damage. I'm afraid we've waited too long. And Mr. Setzer replies to that saying her collapse is imminent. We need to plan for a situation where she's out of the picture. Why aren't some of those non-discriminatory comments on her performance? Well, Your Honor, I would argue that the discriminatory comments in these emails are linked together by the fact that Mr. Setzer and Scott are lobbying for her discharge and describing her in discriminatory and stereotypical ways. So they are, under the guise of commenting on her performance, referring to her in terms that are, we believe, blatantly and clearly discriminatory. The other response to your question, Judge Cole, arguably I think is the appropriate term in this case. They've said that Mr. Haack was the lone decision maker. He is the one that carried out the actual discharge. But given the context of these emails and the fact that Mr. Scott and Mr. Setzer have been lobbying for her discharge for a significant period of time, within the emails that they're referring to her in disparaging terms, I don't think it can be argued that they have influenced Mr. Haack's decision. He may have alone carried out the termination, but he's been lobbied by two principals of PTM. Mr. Setzer was a co-founder of PTM, and when Mr. Setzer and Mr. Haack sold PTM to Veolia, Mr. Scott took over as the president and COO of PTM in charge of their placement contracts, including the SORTA placement contract. So they try to argue that Mr. Scott was never her direct supervisor. Well, that may be true in name only, but it's not true when the facts of the case and the authority that he had over her and her position are taken into account. So- I don't know if we can make a point of the confusion or contention between the parties prior to the termination as to who your client- who was your client's actual employer and the contention that your client was not willing to take the direction from, I guess it was PTM and she was only employed by them, because it's sort of hard to imagine someone being a CEO and she was a CEO of SORTA and not having any employment relationship. What do you make of all that? Well, I think, Your Honor, there's quite a bit of deposition testimony, both with Mr. Setzer and Mr. Haack, regarding the fact that she was an employee of PTM, but she, as the CEO of Metro, owed 100% of her loyalty, her duty of loyalty, to Metro. And they indeed gave her glowing, outstanding performance recommendations. They described her in her 2008 performance review as excellent and nothing short of stellar, that she did an outstanding job. And I think the employment by PTM is not an issue here. We don't dispute that they were, in fact, her employer. But as you've noted, it's important to recognize that as the CEO of SORTA, she owed her duty to them. And the fact that they felt like she wasn't taking direction from them goes to the issue of fact raised by this case in terms of the gender and race-based stereotyping that we have noted as an issue here. She wasn't taking direction. They didn't like her tone. Mr. Setzer testifies at one point in his deposition that he was disappointed in her behavior. They essentially viewed her as a, quote-unquote, uppity black woman. Can I interrupt you one second? Yes, sir. I have a quote that Judge Clay won't mind. I see your time has expired. Do you intend to address whether a pre-apostasy case was made in connection with the discrimination? Yes, Judge, I intend to address that today. Would you care for me to address that in the next minute or so? Yes. Quickly, I have two points that I think are very important looking at the circumstantial evidence analysis and the question of whether a prima facie case has been established. One is that we have presented evidence sufficient to satisfy the fourth prong. There's no dispute with the district court or appellees that the first three prongs have been satisfied. She was replaced initially by Mr. Haack, a white male, and then subsequently by Terry Garcia-Cruz, who is a Hispanic female. The district court summarily concluded that replacing her with a Hispanic female meant that there was no showing under the replacement prong because they were both minority females. Under the Hill v. Foreign Health and other case law that we cited in our brief, we think there's no question that was an error of law, that trying to equate a Hispanic female with an African American female is error. Taking both replacements into account in the context of this case, I believe there's enough evidence to satisfy the prima facie fourth prong. As we know from the Klein v. Catholic Diocese decision, the burden on the fourth prong is not onerous. In addition to that, I think the emails themselves constitute evidence, additional evidence raising an inference of discrimination that supports a finding on the fourth prong. Let me ask you this. I'm sorry to interrupt again, but my understanding is that Mr. Haack said that the reason he gave for terminating your client was that she had lied. She had lied to the sort of board, and your argument is that that is not the legitimate reason or that there's an issue of fact as to whether that was the real reason for termination. And in fact, my argument is that these statements were not even lies. There's some dispute about that. Could you just take 30 seconds to comment on that aspect of the argument? Then we'll need to reserve the rest of your time for rebuttal. I would submit, as the court has noted, that there is at a minimum a dispute about the reasons that they stated. The reason they gave is that she lied on two occasions to the sort of board. We submit her testimony and the documentary evidence demonstrate that she did not lie to the sort of board. She told them Mr. Haack was not immediately available, and that's apparent from the emails, including a June 3rd email and an August 2nd email exchange, in addition to which she testified in her deposition that based on conversations and email exchanges she had with Mr. Haack, she understood him to not be immediately available. The second contention they have is that she lied about the hiring of a consulting firm, MPI. And we have again laid out in our brief the documentary evidence that supports her statement that she did not have a role in hiring them. Again, coming back to the emails, I think under Ursegovich and other cases decided by this court, it's clear that the emails themselves, which evince discriminatory animus, support a finding of pretext. So for both those reasons. Thank you, Ms. Wilson. We don't have very much time. No, you have time for just one or two questions here. On this common patient case issue, given that your client's personal permanent replacement was a Hispanic female, since she was replaced by another female, does that mean that if your client's able to go forward based on gender discrimination, the only basis upon which you'd be able to do that would be direct evidence, since they both were replaced. You wouldn't be going to McDonnell Douglas, given that your client was replaced by another woman. So we'd have to – we wanted to decide or evaluate whether the allegations were sufficient for gender discrimination. You'd have to look at direct evidence only. Would that be the case, or what would you say about that? No, Your Honor, I don't believe that's the case. And I would point the Court's attention to the decisions in Blair v. Henry Filters and another case, Lindsay v. Yates. Judge Cole was on the panel of that decision. The Lindsay case is a housing discrimination case, but they're applying McDonnell Douglas-Verdine Title VII prima facie standard. And that case knows what we know from Verdine, which is that the fourth prong is not meant to be rigid and mechanistic, and that you don't have to show either replacement or unfavorable treatment in every instance, that you have to take the Title VII cases in context on a case-by-case basis. And I would submit that emails, which evince discriminatory intent, even if they're not determined to be direct evidence in and of themselves, nevertheless, as circumstantial evidence, establish that fourth prong. All right, thank you. Okay, Ms. Wilson. Good morning. Good morning. Okay, please, the Court. I'm Susan Bell, I'm a law firm with Morrison-Bassett, and I represent the defendant, Applebee's in this case, PTM, Professional Transit Management, and Tom Hawk. I'd like to make a couple of key points, bring these to the attention of the Court. First, Ms. Shazer was a black, female, single mother when she was recruited. When she was hired as COO, she had no public transportation experience whatsoever. She was promoted within two years over a well-qualified, experienced white male, who was then sorted as CFO for the position of CEO. Her minority status complemented an existing, prior to her hiring, a senior management diversity initiative on behalf of PTM. Second, Ms. Shazer, in her complaint, specifically identified a legitimate non-discriminatory reason for her termination, that being the hostility over the dispute in the summer of 2009 over her desire to become hired directly through SORTA and eliminate PTM's contract with SORTA. The heading on page 15 of the complaint reads, Marilyn Shazer's direct negotiations with SORTA anger and alienate Defendant Hawk and Cesar. In paragraph 54, PTM and Mr. Hawk were frightened that PTM might lose one of its most advantageous contracts In order to protect PTM's financial interests, PTM, Hawk, and Cesar decided that Ms. Shazer had to be eliminated. She reiterated this view in her deposition. Specifically, page ID 2420-21, she's asked, The events of 2009 that ended with the extension of the PTM contract for two more years, some changes made in your non-compete, etc., do you think those events had any bearing on PTM's decision to discharge you? Answer, yes. Why do you believe that? Answer, because they were getting rid of, they were potentially going to lose that contract. She herself has identified a legitimate, non-discriminatory reason, which does not violate Title VII, it does not violate 1983. A non-discriminatory reason for what? She's saying that that led to her termination, that this dispute over this contract issue, and frankly, it was... Your client said that she was terminated for one reason only. Absolutely. And that she told two lies. Absolutely, Your Honor. Now, when we look at the record and we look at all the circumstances and the events leading up to the termination, if it appears to us upon review that the circumstances involved with the termination and whether sustainable or even convincing that she was terminated based upon these or those lies, or a better way to put it, if it seems to be controverted or there's a material factual dispute as to that, as to whether she was terminated for those reasons, what then would that do to your case? If that's the way you... If it turns out that that's the way you wind up doing the record, that's the court. I would respectfully submit that a careful review of the record will not reveal that. Mr. Haack was the sole decision-maker. There has been no dispute other than supposition. Mr. Setzer was her supervisor only up until about August of 2009 when Mr. Haack took over. Mr. Scott was never her supervisor at any point. Mr. Haack had an honest belief based on his attendance at that meeting on August 12th where Ms. Schaetzler lied to the board and lied to his face that he was not available. This was not... She didn't say, I understand that he's not available. In her deposition on this point, she was asked, did you ever have a conversation with Mr. Haack about PTM... I'm sorry, about the hiring of MPI, this union-busting firm, and she denied any such conversation. However, when confronted with the board minute meetings from July 20th where it clearly says she told the board that Mr. Haack is not available but he agrees... The way that we are going through this, the processes that we're taking, that was not true. When she was confronted with that, she backed up and said, oh, well, yeah, I did have a conversation with Mr. Haack about that, but then she couldn't recall any specifics and ultimately says, well, maybe that was a conversation with Bill Desmond. Bill Desmond was Sorda's in-house counsel. Now, Mr. Haack had an honest belief when he heard her lie to his face based on what he was present there hearing. He knew this was a man who had a very long, multi-decade relationship, not with just Sorda, but a over 30-year relationship, a positive relationship with the ATU. He was the key person in the city. There was no one better suited for that role, yet he was kept out. This fits with what Mr. Sensor wrote in his review in 2009 of Ms. Shazer in 2008. He pointed out the fact they want to say that she had outstanding. Granted, she got outstanding on a few issues, but she also had some very critical comments made that fit with this exact situation. Well, don't we have a problem, though, if we can't determine from the record whether she was lying or telling the truth, and in addition, we can't tell from the record whether Mr. Haack had a good faith belief that she was telling the truth or not or whether he was acting protectively because he wanted to get rid of her for improper reasons or because of some discriminatory motivation. If all of that is not discernible from the record and we don't know, it may seem that your client should have done some additional investigation if he wanted to avail himself of a good faith belief doctrine. If all that appears to us, and I can only speak for myself at this point, don't we have something of a problem in getting rid of this case on summary judgment? I don't believe so because, Your Honor, there was— she came to make out a prima facie case, and what Mr. Haack had heard from Mr. Desmond is undisputed. His testimony about that is absolutely undisputed, that Mr. Desmond had told her—he was present at the July 20th board meeting and he told her that Ms. Shazer had lied. Mr. Haack's honest belief was also supported entirely as backed up by the testimony of those sort of board members. They called that meeting on August 12th because they were incredulous that Mr. Haack would not be available to them when he had always been a very responsive individual to their needs. I also want to point out that there are a lot of smoke screens blown up in this case. All of those comments, with the exception of the email that contains the word bitch, which was written by Mr. Scott, who is an African-American man who has spent over 30 years of his life promoting minority individuals in the transportation industry, is the winner of the third Lifetime Achievement Award from Comto. The only—those prior emails all occurred more than a year or more before her termination. The other email that contained the word bitch was written by Mr. Scott to Mr. Setzer. Mr. Haack never saw it. He never received it. In fact, Mr. Haack never—there's no evidence whatsoever that he ever made, participated in any kinds of conversations that were discriminatory in any way. In addition, these—the replacement issue I want to talk about, too, because in fairness to Judge Spiegel, the plaintiff—appellant never argued until the Sixth Circuit brief that the hiring of Cruz was evidence of anything prima facie or otherwise, and they're attempting to use the fact that she was replaced by a woman of color, which is the only point that the parties mentioned. In fact, in her complaint, there were four instances where she says, I was replaced by a white male. In her—the attachment to the complaint, her EEOC charge, I was replaced by a white male. The only comment in the complaint in its entirety is a throwaway that references Ms. Cruz. It says, PTM's announcement that Defendant Haack was merely an interim CEO and that Ms. Shazer would ultimately be replaced by a woman of color. Ms. Terry Garcia-Cruz does not mitigate the protection Title VII affords individual employees. The parties do agree that she was a woman of color, and they are now trying to use the replacement with a woman of color as somehow prima facie evidence of discrimination. There was never any discovery on this issue. The issue was never presented that way to Judge Spiegel. Judge Spiegel made this reference in a footnote, footnote four of his decision, where he is actually working into why their sex-plus, race-plus claims have no merit. So there's no mention in their reply and support. They now come here talking about circumstantial evidence, and they want to rely on circumstantial evidence in the McDonnell-Douglas test. In their motion for summary judgment, it was entirely based on direct evidence. Their entire case centers around these e-mails. As you pointed out, Your Honor, these e-mails reflected frustration with a woman that they had brought in, trained, promoted, and got her into the CEO position. And once she was there, she shut them out. She did everything possible to try to discourage her own employees or staff from speaking with them. The problem is you're saying she got into the job and shut them out and all that. But at the same time, you're claiming she was only fired for telling two lies. With all these events transpiring, how is it credible that those were the real reasons that she was fired? I would encourage you to look carefully at Mr. Setzer's review and also Mr. Haack's testimony on this issue in 2009. Once they had resolved the contract issue and the extension was in place and they performed her review, they were critical of her for her behavior at that time. That's about the same time as these e-mails were being exchanged. But what they did do in an unprecedented move, they gave her a raise. Mr. Haack testified, we gave her the pay increase because of the situation that was going on at the same time with respect to Marilyn Shazer and Melanie Richardson trying to have the board hire Marilyn directly to show her good faith and that we were putting it all behind us in going forward and that's why we gave her a 3% increase. I told Mike Setzer that that's what we needed to do because we wanted to start fresh and make sure there were no lingering issues. They gave her the benefit of the doubt after all of this went on. Mr. Setzer even noted the unprecedented nature of this increase in the agreement itself. It is unprecedented for PTM to award a salary adjustment greater than its fee increase. We have agreed to extend the contract with no fee increase. That means their contract with SORA. So you should recognize that this is something not previously done. The peculiar circumstances surrounding the last six months and PTM's desire to reach a resolution satisfactory to all is the reason for this. It is my hope that we can go forward with a positive attitude and achieve very good things for our client. That would benefit everyone. There was this dust up in 2009. It was resolved by this time. In PTM's view and as expressed on her review itself where they were critical of issues, that there was a negative effect on her staff's perception, that employees and board members and the union and peers have expressed dissatisfaction with her accessibility and some board members feel rebuffed and ignored. They had moved on. But all of that was in the background. And when he heard her make these lies to the board, he could not. His goal was to do the best he possibly could for SORA. And the woman that he had in that position had lied to him, had lied directly to him. He cut her off in that meeting. And interestingly enough, Ms. Shazer has no recollection. She must have blanked it out. She has no recollection of what happened in that August 12th. She could not cite the fact. She had no defense. She made these misrepresentations about Mr. Hock's availability and her involvement in the hiring of MPI, which was an issue of great concern to a number of the board members like Mr. Sizemore, Mr. Rutless, and the ATU president, Mr. Bennett. Mr. Hock's honest belief doesn't have to be accurate, but all the pieces line up to give him the basis for an honest belief. And we believe, Your Honor, that if you look at the facts of this case in their entirety, you will agree with that position, that there was no reason other than this. Mr. Scott was not involved. I do want to point out, Mr. Scott, the one mistake in Judge Spiegel's decision is that Mr. Spiegel repeats that Mr. Scott was present for the termination. He was not. The individual that was there with Mr. Hock and Ms. Shazer was John Rabasio, a SORBA attorney who was merely keeping notes, and the record of those contemporary notes was produced and discovery notes attached in the record. With all due respect, Your Honor, my time is running out, and we would ask that you affirm Judge Spiegel's decision that there are no genuine issues of material fact here. Okay. Thank you. Your Honors, I think the key point to note in rebuttal to Apelli's argument that was just presented is all of the discussion about the record and how the facts should be interpreted points clearly to what we've said in our brief, which is that there are material questions of fact, issues of credibility that have to be decided by the trier of fact and are inappropriate for summary judgment. In terms of Mr. Hock's assertion that this was based on the honest belief, he did not conduct any investigation. He simply was at a meeting where he determined subjectively on his own that statements she made were untrue. She has testified that she did not lie to the SORBA board. We have documentary evidence supporting her position, both with respect to her understanding of Mr. Hock's unavailability and the fact that she tasked an executive committee of her staff with the decision-making for hiring the consultant MPI. Mr. Hock did not base his determination about these lies on particularized facts. They want to bootstrap testimony by members of the SORBA board that was taken during the course of discovery into Mr. Hock's decision-making. He didn't talk to any of those individuals. He himself said, I was the lone decision-maker. I did not consult with anybody. So in terms of the honest belief, it has to be based on particularized facts at the time that the decision is allegedly made based on that belief. And I would submit that all of the discussion about whether this belief was honestly held or not, again, raises a genuine issue of material fact that is not appropriately resolved on summary judgment but needs to be resolved by the trier of fact. Insofar as there's an attempt on the part of the Peleys to raise some kind of inference, same-actor inference, based on the fact that Mr. Scott was involved in the hire and we have submitted he clearly has his fingerprints on the ultimate termination decision, the Wexler case is clear that that kind of inference may be permissible but is something that has to be resolved by the trier of fact. As far as Mr. Scott's membership of the African-American community or Scott as an African-American, we know from the Oncoli decision and the Wexler decision that the court does not permit an inference that there is no intraracial discrimination. That simply can't be considered. We can't conclude that because he's African-American and she's African-American that there can be no discriminatory intent on his part. Again, Your Honors, I would simply like to state that while we did file a motion arguing that we believe that discriminatory remarks constitute direct evidence, the district court's determination that they were not direct evidence doesn't mean that those remarks should be ignored in this case. They're clearly evidence. Whether they're deemed direct or circumstantial, they're evidence of discrimination. And we want to keep in mind in this case, as in all Title VII cases, the ultimate issue and the ultimate question, the key for resolution, is determining whether plaintiff has presented sufficient evidence, be it direct or circumstantial, from which a reasonable juror could conclude that she was terminated for discriminatory, impermissible reasons. At a minimum, in this case, there are questions of fact regarding the level of supervision and influence Mr. Setzer and Mr. Scott had. We submit it's clear that they were part of the decision-making process, but at a minimum, there's a question of fact there. There are questions of fact with respect to pretext and whether the reasons submitted are the real reasons, the honest belief rule as well as the emails themselves evidencing discriminatory intent. So we would respectfully ask that the court reverse this case and remand it to the district court so that those questions of fact can be properly decided by a jury. Okay. Well, thank you, Ms. Wilson and Ms. Bell, for your arguments today. The case will be submitted and then the Department of Public Instance.